FILED
IN CLERKS OFFICE
2026 SEP -3 P 12:48
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JAMES FASCI,
Plaintiff,

v.

SECURITAS SECURITY SERVICES USA, INC., and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ,
Defendants.

Civil Action No. ______________

**JURY TRIAL DEMANDED**

## COMPLAINT

### I. NATURE OF THE ACTION

1. This is a hybrid action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the duty of fair representation implied under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a).

2. Defendant Securitas Security Services USA, Inc. ("Securitas") discharged Plaintiff without just cause, in breach of the collective bargaining agreement between Securitas and Defendant Service Employees International Union, Local 32BJ (the "Union").

3. The Union breached its duty of fair representation in its handling of the grievance and arbitration that followed, and its breach seriously undermined the integrity of the arbitral process within the meaning of *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567–68 (1976). The adverse arbitration award of April 9, 2026 therefore does not bar this action.

4. Plaintiff seeks make-whole relief: reinstatement or front pay, back pay, lost benefits, interest, and costs, with damages apportioned between Defendants according to the damages caused by the fault of each. *Vaca v. Sipes*, 386 U.S. 171, 197 (1967); *Bowen v. United States Postal Service*, 459 U.S. 212, 223–24 (1983).

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 29 U.S.C. § 185(a) and 28 U.S.C. §§ 1331 and 1337. The duty-of-fair-representation claim arises under federal labor law and is within the Court's jurisdiction as pendent to, and interdependent with, the Section 301 claim.

6. Venue lies in this District under 28 U.S.C. § 1391(b). Plaintiff was employed, and was discharged, in this District; the arbitration hearing was held in this District; Securitas is registered to do business in Massachusetts, maintains a registered agent in Boston, and does substantial business in this District; and the Union represents employees, and administers the collective bargaining agreement at issue, in this District.

## III. PARTIES

7. Plaintiff James Fasci resides in Brighton, Massachusetts. He served as a security officer assigned to Harvard University sites in Cambridge and Boston for more than seventeen years, beginning in or about May 2007 — initially employed by AlliedBarton Security Services and, from on or about August 1, 2009, when Securitas succeeded to the Harvard security-services contract and retained the incumbent officers, by Securitas until his termination — and was at all relevant times a member of the bargaining unit represented by the Union.

8. Defendant Securitas Security Services USA, Inc. is a Delaware corporation with a principal office at 9 Campus Drive, Parsippany, New Jersey, registered to do business in Massachusetts since 2002 (Mass. SOC ID 710912217), with a registered agent at 155 Federal Street, Suite 700, Boston, Massachusetts. Securitas is an "employer" in an industry affecting commerce within the meaning of 29 U.S.C. §§ 142 and 185.

9. Defendant Service Employees International Union, Local 32BJ is a labor organization representing employees in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(5) and 185, with a principal office at 25 West 18th Street, New York, New

York. At all relevant times the Union was the exclusive collective bargaining representative of Plaintiff's bargaining unit.

## IV. THE COLLECTIVE BARGAINING AGREEMENT

10. Securitas and the Union were parties to a collective bargaining agreement effective November 16, 2021 through November 15, 2025 (the "CBA"), which governed Plaintiff's employment, his discharge, and the grievance and arbitration that followed.

11. Article 27, Section 1 of the CBA limits Securitas's disciplinary authority to discipline for cause: among the enumerated management rights is the right to "discipline, suspend, or discharge Employees for just cause."

12. Article 34 of the CBA provides in full: "After a period of twelve (12) months following issuance, no written warnings, discipline notices or reprimands shall be counted against an employee for any employment purpose."

13. Article 32 of the CBA establishes a grievance and arbitration procedure culminating in arbitration, and provides that "[t]he decision of the Arbitrator shall be final and binding upon the grievant, the Employer and the Union." It is that finality which, by operation of *Hines*, does not bar this action on the facts pleaded below.

14. Article 36, Section 1 of the CBA addresses transfers and assignments, including a "Non-Disciplinary Transfer and/or Assignment" mechanism for situations in which "the customer / client has requested the removal, transfer and/or reassignment of an Employee" without a reason constituting just cause.

## V. FACTS

### *A. Plaintiff's employment and protected activity*

15. Plaintiff served as a security officer at Harvard University sites for more than seventeen years, beginning in or about May 2007. Over that tenure he served as a union shop steward, on the health and safety committee, and in support of contract negotiations.

16. Plaintiff was an active and visible advocate within the bargaining unit, including on wage-payment practices, beginning no later than 2021.

17. At the time of the events below, Plaintiff had a pending grievance against Securitas (No. 131005-24), filed in July 2024, arising from two client-requested removals from posts, Securitas's failure to reassign him, his non-selection for positions he had bid on, and lost wages and holiday pay — $5,713.11 by the time Securitas proposed to settle it. On July 11, 2024, Plaintiff described that conduct to the Union in writing as retaliation for insisting on his rights under the contract and for his service as a shop steward. By March 2025 the grievance stood at the final step before arbitration, and the Union had told Plaintiff it would likely proceed to arbitration.

18. Plaintiff had taken protected medical leave and had experienced medical episodes at work known to Securitas: one in late February 2024, at a Harvard Business School post, in the presence of Securitas supervisors, after which an ambulance evaluated him; and one on January 30, 2025 — approximately six weeks before his suspension — in which he left his post by ambulance. On March 18, 2025, Plaintiff submitted a written request for time off stating that it was "to attend medical appointments"; the request was forwarded to Securitas management, including its labor-relations manager and its Area Vice President, the same day.

***B. The investigation, suspension, and discharge***

19. In or about March 2025, the general manager of the on-site café at one of Plaintiff's assigned Harvard sites relayed a complaint, through intermediaries, that Plaintiff had taken food without paying. The complaint asserted that the conduct occurred "several times a week for several weeks" and that Plaintiff "ha[d] never returned to pay for the items."

20. On March 18, 2025, during the investigation, Plaintiff responded in writing to Securitas Labor Relations manager Alonzo Herring, attaching a record of approximately 84 café charge-card transactions totaling $187.21 over approximately 140 working days, documenting his history as a regular paying customer, and stating: "I am an honest person, but,

even if I wasn't, it would be simply foolish to risk so much for a $4.00 lunch. If there was an error I made, it was unintentional." Plaintiff forwarded the same response to Securitas manager Angela Kinyua.

21. On March 13, 2025, Securitas suspended Plaintiff indefinitely without pay, pending investigation; its labor-relations manager confirmed in writing on March 19 that Plaintiff was "suspended from work, without pay, pending the conclusion of the Company's official investigation."

22. By letter dated March 28, 2025 and delivered on or about April 4, 2025, Securitas terminated Plaintiff's employment effective April 3, 2025. The letter issued over the name of Area Vice President Christopher R. Connolly, with Mr. Herring among those copied. Its stated grounds, arising from the café conduct, were violation of policies prohibiting theft or other dishonesty and providing false information to management.

23. Plaintiff's consistent practice at the café, known to its cashiers, was as follows: when the café was busy during his break, Plaintiff would make clear to the cashier that he would settle up later — returning later that day when the café was not busy, clearing the balance the next morning when he bought his coffee, or clearing it the next time through when lunch was slower. Any failure to complete payment on a particular occasion was inadvertent error within that practice, not a refusal to pay. Plaintiff described the core of this practice — signaling the cashier, obtaining assent, settling up later — at Securitas's investigative meeting on March 17, 2025, attended by his union representative, Ryan Akerley, as the termination letter's own transcription of the meeting reflects.

24. Securitas's own presentation conceded the communicative element of that practice. Its counsel stated in his opening at the later arbitration that the video shows Plaintiff "making a hand motion to the cashiers to indicate that he'll come back later to pay," and its post-hearing brief stated that "he made a signal to the cashiers." The termination letter's own

video log likewise records, on each of the four dates it describes, that Plaintiff by-passed the cashier "while pointing to the item he is holding in his hand."

25. Securitas's investigation record likewise recorded Plaintiff's statement that he paid cash for small purchases — payments a charge-card analysis could not capture. The four dates ultimately alleged — February 25 and March 3, 4, and 5, 2025 — were not consecutive, and the charge-card record Plaintiff submitted, reproduced in the termination letter itself, showed café purchases on March 6, 7, and 13, 2025. By the termination letter's own account, the charge set was assembled in stages: the initial review of the camera recordings identified March 3 and 4 only, and February 25 and March 5 were identified afterward, when — in the letter's words — "following the investigatory meeting and your submission of dates on which you made card charges, the Company continued review of that week and the preceding week."

26. The deciding official — who testified that he "ultimately made the decision to terminate" — admitted at the arbitration hearing that the indefinite suspension preceded any review of the video evidence and that no other investigation preceded it; that he spoke with no café employee and that, to his knowledge, neither did anyone else in the investigation; and that he reviewed Plaintiff's disciplinary file in making the termination decision.

27. Plaintiff's disciplinary file contained a September 2016 disciplinary record — more than eight years old at the time of the termination decision. Under Article 34 of the CBA, that record could not be "counted against" Plaintiff "for any employment purpose."

***C. Context bearing on motive***

28. On February 21, 2024, Securitas Labor Relations manager Herring issued a memorandum, copied to Securitas Area Vice President Christopher Connolly, to approximately 45 guards, threatening termination for failure to comply within a stated deadline.

29. The surveillance footage on which Plaintiff's discharge rested was supplied to Securitas by its client: as Securitas's witness testified, "These came from the building manager,

our client." Plaintiff had previously been the subject of two client-requested removals from posts, effected in writing through the Article 36 mechanism described in paragraph 14.

30. On the grievance described in paragraph 17: Securitas transmitted a settlement stipulation on September 30, 2025 fixing the wage amount at $5,713.11, conditioned on withdrawal of the grievance with prejudice. Plaintiff declined in writing to sign it pending independent legal review and formally requested that no settlement be concluded over his objection; the Union responded in writing that it reserved the right to settle the claim over his objection. Plaintiff never signed it, and the copy in the record bears no signatures. The wages were paid in late December 2025 (on December 23, Securitas advised that the payment would be processed that week and a check overnighted; Plaintiff confirmed receipt on December 29) — nearly three months after Securitas itself had fixed the amount — and Plaintiff accepted the payment in writing "as satisfaction of the undisputed back wages only," with the Union copied. Securitas thereafter refused Plaintiff's statutory demand regarding the late payment, stating: "The Company considers this matter closed." These facts are pleaded as evidence bearing on motive and pretext, not as a separate claim in this action.

***D. The grievance, the arbitration hearing, and the Union's conduct***

31. The Union grieved Plaintiff's termination and took the grievance to arbitration. A hearing was held on November 12, 2025 before Arbitrator Susan R. Brown. A certified stenographic transcript of 171 pages was taken.

32. At the hearing, the Union called no witnesses other than Plaintiff. It introduced no surveillance recordings. It did not present the documentary evidence bearing on retaliation that Plaintiff had assembled and made available to Union counsel before the hearing — on November 6, 2025, by giving counsel written access to a compiled evidence site and document repository, and on November 7, 2025, by the links he sent her, including to the memorandum — including his November 6, 2025 memorandum characterizing the 2024 client-requested removals described in paragraph 29 as retaliation for his union activity, the client-removal

documents (which, as the memorandum noted, counsel already had), and the medical and leave correspondence described in paragraph 18.

33. Securitas's counsel played employer-selected excerpts of café video, telling the arbitrator he would "produce, enmasse [sic], all of the video, if you'd like them," but "I don't think we need it for purposes of this. The time in the cafeteria is the only thing that I'll show." The arbitrator expressly invited the Union to request any additional portion of the footage: "I'm comfortable. And the union can object. The union can say yes, but we want to see this particular part." The Union requested none.

34. The other body of footage — from the camera at Plaintiff's own guard post, which Securitas's witness testified had been reviewed in the investigation and used to establish Plaintiff's departure times — was never shown to the arbitrator or requested by the Union, although the arbitrator herself asked whether it would be shown.

35. During its examination of its sole witness, Securitas's counsel introduced a set of termination letters concerning other employees as claimed evidence of past practice — documents that, in his words, "were only put together by me, as counsel, yesterday." The Union objected that it had received them without notice and had had no opportunity to investigate whether the underlying grievances "were challenged or if they were adjusted." The arbitrator accepted the documents but told the Union: "you'll have time to do whatever you need to do. We can break the hearing and go another day." The Union's counsel herself asked to "hold the record open until we can do that search." In her closing ruling, the arbitrator held the record open for two weeks expressly "to give the union the opportunity to investigate the other terminations for theft." On November 14, 2025 — within that window — Plaintiff asked Union counsel in writing for copies of the comparator documents. On December 24, 2025, Union counsel wrote that the arbitrator's proposed schedule for closing the record had been "dependent on the unions review of the videos as well as our investigation of the other disciplinary reports that the employer relied on." On January 22, 2026, she wrote to the

arbitrator that the Union had finished reviewing the video footage and that, "at this time," it did not need a second day of hearing; the comparator investigation was not mentioned. The second day the arbitrator had offered was the Union's to request; it never requested one, and the matter proceeded to briefs. In February 2026, responding to Plaintiff's written inquiries, Union counsel stated in writing that the arbitrator had held the record open "only for us to raise any issues with the video footage"; Plaintiff corrected the misstatement in writing the following day, quoting the ruling's actual terms and asking what had come of the comparator investigation. The Union submitted no comparator-investigation material before the record closed, and its post-hearing brief did not address the comparator documents.

36. During the hearing, Securitas's counsel introduced the September 2016 disciplinary record — then more than nine years old — and used it to attack Plaintiff's credibility. Plaintiff himself invoked the record-retention rule from the witness chair, answering that he did not know of any such notice "because we're supposed to discard all the records past a certain point," and testified that, as he understood it, the 2016 complaint had resolved with a finding that he "was not at fault." Union counsel's only stated objection was that she had not previously seen the document — not the contractual ground stated in Article 34 — and she took no redirect examination. The 2016 document itself was never admitted into evidence; the arbitrator remarked that it was "not, particularly, relevant." The testimony remained in the record.

37. That same day, in the post-hearing debrief, Plaintiff raised the Article 34 issue directly with the Union's arbitration counsel, and raised it again the same day with his Union representative. He memorialized it in writing to Union counsel on November 14, 2025 — two days after the hearing — raised it in writing again on November 19, 2025, and repeatedly thereafter.

***E. The post-hearing period: the Union's representations and omissions***

38. On December 12, 2025, the Union's General Counsel wrote to Plaintiff that arbitration counsel "is happy to share the draft of her brief when it's ready and review any input you have," while noting the final brief was counsel's judgment.

39. The draft brief was never shared. The Union filed its post-hearing brief on March 3, 2026 without showing Plaintiff the draft. On April 1, 2026, the Union's General Counsel wrote that counsel had "determined it wasn't necessary and wouldn't be productive to share the actual draft."

40. The Union's arbitration counsel made contradictory written statements about the central video evidence: in late December 2025 she confirmed receipt of the videos and stated she would "review the videos today"; on January 7, 2026 she wrote that she did "not currently have access to the full videos" and was "locked out"; on January 22, 2026 she wrote "I have reviewed the video and do not see anything that necessitates a second day or hearing to address." In a text message on December 29, 2025, counsel stated that she had "left the videos with IT." On the afternoon of January 7, 2026, after Plaintiff asked in writing that the local files or the hard copy be sent to him by courier, she replied in writing that the full videos were "on the link provided." In the telephone call that followed, of which Plaintiff made contemporaneous handwritten notes, she stated that the Union had only short clips of the footage. The link, forwarded that evening, led to a file-sharing system operated by the firm representing Securitas. That system bore the firm's branding, and access to it required credentials arranged through the firm.

41. The Union's arbitration counsel also acknowledged in writing, on January 22, 2026, that the post-hearing briefing schedule was being arranged through undocumented telephone communications with Securitas's counsel: "we never had a finalized date- it was always tentative. I have been communicating with Liam o[']Connell on the phone."

42. Throughout the same period, Plaintiff pressed the Union in writing to complete the evidentiary record. On November 14, 2025, he asked Union counsel in writing for the hearing transcript, all of Securitas's exhibits, and "a copy of the video evidence that was reviewed," and asked that the post-hearing brief address the Article 34 violation. On December 1, 2025, he sent counsel a written comparative analysis distinguishing each of the comparator termination letters the employer had introduced, together with anonymized summaries of each case, and asked counsel to confirm the video-review deadline; he received no response. On December 29, 2025, he sent counsel written observations to aid her stated review of the footage. He offered to assist the review himself — in writing on December 24 (a screen-share during her review) and December 29, 2025 (to come to the Union's office or to review by Zoom screen-share), and by telephone on January 7, 2026, offering to travel to New York or Boston to do so. Counsel replied in writing that she would review the footage and arrange to share it with him, responded to the telephone offer, in substance, that it would not be necessary, and took up no offer. On January 23, 2026, he made a written eleven-point evidentiary request — including that the post-hearing brief address Article 34; that the Union call the cashier identified in the video evidence; that it secure and review footage from other dates bearing on his payment practice; and that it move for an adverse inference as to withheld footage from the mornings following the dates at issue — expressly asking for "a written legal or strategic rationale" for any omission. He followed up in writing on January 26, 2026. On February 24, 2026, counsel wrote that she would "incorporate those into our written brief"; the brief filed on March 3 did not address Article 34. The Union provided no written legal or strategic rationale — only acknowledgments that the arguments were under review, promises to "get back" and to "incorporate" them, and the February 2 statement described in paragraph 35 that the record was open only for video issues — and did not call the identified cashier, secure the requested additional footage, or invoke Article 34; its post-hearing brief did,

however, ask the arbitrator to draw an adverse inference from the Employer's failure to produce a complete video review.

43. On March 4, 2026 — the day after the briefs were filed — the Union's arbitration counsel declined Plaintiff's request that the Union file a reply brief. Her stated reason was: "The Employer specifically notes in their brief that there was no prior discipline, but there were two non-disciplinary customer removal requests that were discussed during your cross examination. They did not rely on this in their argument to support their decision to terminate. Therefore, I do not think we should raise/ flag for the arbitrator the issue of 'stale' discipline."

44. That stated reason rested on a reading of the employer's brief that its own text contradicts. Printed page 15 (PDF page 16) of Securitas's post-hearing brief expressly invoked the September 2016 disciplinary record to impeach Plaintiff's testimony: "Mr. Fasci testified that he had no prior 'significant discipline'... However, on cross examination, he admitted that in September of 2016 he was 'disciplined...'" That impeachment passage rested on testimony it mischaracterized — Plaintiff had testified that, as he understood it, the 2016 complaint was resolved with a finding that he was not at fault — and on a document never admitted into evidence. Plaintiff pointed the misstatement out to Union counsel in writing on March 12, 2026. No reply brief was filed. The Union thus never invoked Article 34 — not at the hearing, not in its brief, and not in the reply it declined to file on that misreading — while the employer used the stale record to impeach its member.

45. The Award records the handling of the tapes in its own words: "While the Employer did not provide the tapes to the Arbitrator, the Union did not either. Apparently, the Union reviewed the tapes after the arbitration hearing but chose not to submit them." Whether the Union in fact reviewed the tapes, when, and to what extent is a matter within the Union's knowledge: its counsel's written statements on the subject were contradictory (¶ 40), and

Plaintiff's offers to assist a review were declined (¶ 42). What is certain is that the tapes were never submitted.

46. Although a transcript of the hearing was taken and a transcript was circulating among the parties months before the briefs were filed — the Union's counsel transmitted a transcript to Plaintiff on January 7, 2026 — the arbitrator was, in her own words, "provided only with selected sections" of the transcript. The award's sole footnote states that a transcript "was taken but not considered" and that the arbitrator relied on her own notes. Who furnished the arbitrator with those selected sections, on what basis they were selected, and why neither party furnished her the complete certified transcript are matters within Defendants' knowledge.

***F. The Award***

47. The arbitrator issued an Opinion and Award dated April 9, 2026, denying the grievance and upholding the termination.

48. The Award does not reconcile the transcript's record that selected video excerpts were played at the hearing with its statement that the Employer "did not show the videos at arbitration or submit them as evidence but written summaries were included in Mr. Fasci's termination letter." It separately summarizes the Union's contention that "the video clips provided were selective." The complete recordings were never submitted to the arbitrator.

49. The Award rests its dispositive finding on "[t]apes of four straight days" — recordings the Award itself states were never provided to the arbitrator — and characterizes the Employer's video presentation as "only second-hand evidence: no witnesses and no crucial tapes…".

50. The Award's central inference fails on its own dates: it reasons that "a single occurrence might have been a lapse of memory but four days in a row destroys that argument." Yet the four dates in evidence — February 25 and March 3, 4, and 5, 2025 — are not four days in a row on any calendar.

51. The Award never decided the Article 34 question. It treats the prior disciplinary record as "immaterial to the question of just cause" and frames the only question before the arbitrator as whether Plaintiff committed the acts alleged. Whether Securitas breached Article 34 — in the termination decision (¶¶ 26–27) and at the hearing (¶ 36) — was never adjudicated.

52. The dispute the Award actually resolved was not whether Plaintiff communicated with the cashiers — Securitas conceded he did (¶ 24) — but whether he later returned to pay: a question the Award answered against him on recordings it states it never received, without testimony from any café employee, and without the guard-post footage bearing on his movements.

***G. Administrative proceedings***

53. Plaintiff filed unfair labor practice charges with the National Labor Relations Board against Securitas (Case 01-CA-374267, filed September 30, 2025, as amended) and against the Union (Case 01-CB-379824). Both charges were dismissed at the regional level — the discharge allegation against Securitas on July 15, 2026, in deference to the arbitration award — and Plaintiff's appeals from both dismissals are pending before the NLRB Office of Appeals. This action arises under Section 301 and the duty of fair representation, and is independent of those administrative proceedings.

***H. Notice and accrual***

54. The Award is dated April 9, 2026. The Union transmitted it to Plaintiff on April 14, 2026, writing "unfortunately we did not prevail and she upheld the termination."

55. On or about April 17, 2026, the Union informed Plaintiff by telephone that its actions on his behalf were concluded.

56. This action is timely under *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983). A hybrid claim of this kind challenges the award itself: the injury *Hines* recognizes — an arbitral outcome procured through a process the Union's breach

seriously undermined — was not complete before the Award issued on April 9, 2026. This action is filed within six months of that date, of the April 14, 2026 transmittal, and of the April 17, 2026 communication. It is also filed within six months of March 4, 2026, the date of the Union's final act of representation preceding the Award — the declination of a reply brief (¶ 43).

## VI. COUNT I — BREACH OF THE COLLECTIVE BARGAINING AGREEMENT (LMRA § 301) — AGAINST SECURITAS

57. Plaintiff realleges paragraphs 1–56.

58. The CBA permitted Securitas to discharge Plaintiff only for just cause (¶ 11).

59. Securitas discharged Plaintiff without just cause. The conduct alleged was, at most, inadvertent error within a communicated, acknowledged practice of deferred payment (¶¶ 23–25); the triggering complaint's characterization was unsubstantiated (¶¶ 19, 25); the investigation was cursory — suspension before any video review, no interview of any café employee, and half the charged dates assembled only after the investigative meeting (¶¶ 25–26); and the stated ground was pretextual. The pretext inference rests on facts the Union never documented before the arbitrator — the Award records that Plaintiff "provided no evidence other than his discharge" to support his retaliation claim (¶ 32): Plaintiff's protected medical leave and the medical episodes known to Securitas, including his departure from his post by ambulance six weeks before his suspension (¶ 18); his written medical-leave request of March 18, 2025, forwarded the same day to the labor-relations manager and to Mr. Connolly — the official who ten days later signed the termination letter (¶¶ 18, 22); the client-removal history (¶¶ 14, 29); and the discharge of Plaintiff while his grievance over the client-requested removals — conduct he had characterized to the Union in writing as retaliatory — stood at the final step before arbitration, with the Union having told Plaintiff it would likely go there (¶¶ 17, 29, 30).

60. Securitas further breached the CBA by counting against Plaintiff a disciplinary record more than twelve months old, contrary to Article 34: at the arbitration, where it introduced the 2016 record to impeach his credibility and invoked that record again in its post-hearing brief (¶¶ 36, 44) — a use against him in a proceeding concerning his employment; and, in the alternative, in the termination decision itself, through the deciding official's review of the disciplinary file containing the 2016 record in making his decision (¶¶ 26–27).

61. Plaintiff exhausted the CBA's grievance and arbitration procedure through the Union (¶ 31). By reason of the Union's breach of its duty of fair representation pleaded in Count II, which seriously undermined the integrity of the arbitral process, the resulting award does not bar this claim. *Hines*, 424 U.S. at 567–68.

62. As a direct result of Securitas's breach, Plaintiff lost his employment, wages, and benefits, and suffered consequential losses.

## VII. COUNT II — BREACH OF THE DUTY OF FAIR REPRESENTATION — AGAINST LOCAL 32BJ

63. Plaintiff realleges paragraphs 1–56.

64. As Plaintiff's exclusive bargaining representative, the Union owed him "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

65. The Union breached that duty. Its handling of the arbitration was arbitrary, perfunctory, and in bad faith, in at least the following respects:

a. it called no witnesses other than Plaintiff and presented none of the assembled documentary record supporting his retaliation theory (¶ 32);

b. it requested no portion of the surveillance footage, despite the arbitrator's express invitation, and never obtained for the record the guard-post footage bearing on Plaintiff's movements (¶¶ 33–34);

c. it failed to invoke Article 34 against the employer's use of a nine-year-old disciplinary record — at the hearing, in its brief, and in the reply it declined to file — despite Plaintiff raising the issue on the hearing day, in writing on November 14 and November 19, 2025, and repeatedly thereafter; and it took no redirect examination after the record was used against its member (¶¶ 36–37, 44);

d. it declined to file a reply brief on a stated reading of the employer's brief that the brief itself contradicted, and adhered to that course after the error was pointed out in writing (¶¶ 43–44);

e. it promised in writing to share the draft brief with Plaintiff and to review his input, then filed the brief without sharing it — while Plaintiff's specific written requests concerning its contents, including that it address Article 34, were pending and unaddressed (¶¶ 38–39, 42);

f. on the Award's own account, the tapes were never submitted to the arbitrator — a non-submission the Award expressly counted against Plaintiff — after the Union declined Plaintiff's offers to assist review of the footage and left his written requests to secure it unanswered (¶¶ 42, 45, 49);

g. it had obtained the certified transcript by January 7, 2026 — it transmitted a copy to Plaintiff that day — yet its post-hearing brief cited no part of it and it did not submit it; the arbitrator, "provided only with selected sections," did not consider the transcript and decided the case on her own notes (¶ 46);

h. it gave no rationale — beyond the misstatement of the open-record ruling described in paragraph 35 — for declining, and did not take, the specific steps identified in Plaintiff's January 23, 2026 written evidentiary request — calling the identified cashier, securing the additional footage bearing on his payment practice, and addressing Article 34 in the briefing (¶ 42); and

i. it submitted no comparator-investigation material during the two-week window in which the arbitrator held the record open expressly "to give the union the opportunity to investigate the other terminations for theft," and made no use of the comparator documents in its brief, despite Plaintiff's written request, within the window, for copies of those documents (¶ 35).

66. This conduct was not tactical judgment within a "wide range of reasonableness." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 78 (1991). A reply-brief waiver premised on a misreading of the opposing brief, adhered to after written correction; a brief filed unshared, over the member's pending written requests concerning its contents and after a written promise of review — so that defects identified to the Union in writing before filing went uncorrected; an eleven-point written evidentiary request answered only with acknowledgments, unkept promises to "get back" and to "incorporate" the arguments, and a misstatement of the open-record ruling — never with a legal or strategic rationale; the failure to invoke an unambiguous contractual bar the member repeatedly identified, while the employer used the barred record to impeach him; and a record held open for a stated purpose the Union then abandoned — each is arbitrary or in bad faith under *Vaca*, and together, despite the Union's cross-examination, submission of Plaintiff's testimony and charge-card evidence, and arguments concerning selected video, missing witnesses, adverse inference, proportionality, and retaliation, they left material gaps on the dispositive deferred-payment question.

67. The Union's breach seriously undermined the integrity of the arbitral process. *Hines*, 424 U.S. at 567–68. The Award rests on the very vacuum the Union's conduct created: a dispositive finding entered on recordings never received (¶ 49), with the Union's own non-submission expressly counted against Plaintiff (¶ 45), decided on "selected sections" of a transcript the Union held in full and neither cited nor submitted (¶¶ 46, 65(g)), and without the

witnesses and footage that could have tested the Employer's account on the only disputed question (¶ 52).

68. But for the Union's breach, the outcome of the arbitration could have been different. What limited cross-examination alone achieved — the admissions of the deciding official (¶ 26) — shows what a full presentation could have reached; the complete footage, the café-employee witnesses, an Article 34 objection, the comparator investigation the record was held open for, and a reply brief addressing the employer's strongest submissions each bore on the question the Award resolved against Plaintiff. Given the practice pleaded in paragraph 23, footage from the mornings following the dates at issue and the testimony of the café cashiers bore most directly on that question; Plaintiff asked the Union in writing to secure both, and it secured neither. The excerpts that were played at the hearing showed — as Plaintiff observed from his own viewing of them — Plaintiff signaling to the cashiers and awaiting the cashier's assent: the communicative element Securitas's own presentation conceded (¶ 24).

69. As a direct result of the Union's breach, Plaintiff lost the meaningful arbitration of his discharge to which the CBA entitled him, and suffered the continuing loss of his employment, wages, and benefits.

## VIII. INTERDEPENDENCE OF THE CLAIMS

70. The claims against Securitas and the Union are interdependent as a matter of law. To prevail against either Defendant, Plaintiff must prove both that Securitas breached the CBA and that the Union breached its duty of fair representation. *DelCostello*, 462 U.S. at 164–65. Both are pleaded, and both are supported by the facts alleged above.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) order Securitas to reinstate Plaintiff to his former position, or award front pay in lieu of reinstatement;

(b) award back pay, lost benefits, and prejudgment and postjudgment interest;

(c) apportion damages between Securitas and the Union according to the damages caused by the fault of each, *Vaca v. Sipes*, 386 U.S. 171, 197 (1967); *Bowen v. United States Postal Service*, 459 U.S. 212, 223–24 (1983);

(d) award Plaintiff his costs; and

(e) grant such other and further relief as the Court deems just.

**X. JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable. Fed. R. Civ. P. 38(b); *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558 (1990).

Respectfully submitted,

James Fasci, *pro se*
6 Lawrence Place
Brighton, MA 02135
james.fasci@gmail.com
(617) 487-4448

Dated: September 3, 2026